1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT
9                    FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   ADRIAN F. MURPHY,                           No.  2:13-cv-1760 AC
12                    Plaintiff,
13            v.                                  ORDER
14   CAROLYN W. COLVIN, Acting
     Commissioner of Social Security,
15
                     Defendant.
16

17

18        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security
19   ("Commissioner") denying her application for a period of disability and disability insurance
20   benefits ("DIB") under Title II of the Social Security Act.  The parties' cross-motions for
21   summary judgment are pending.  For the reasons discussed below, the Court will grant in part
22   plaintiff's motion for summary judgment and will deny defendant's motion for summary
23   judgment.
24                           PROCEDURAL BACKGROUND
25        The procedural history of this case is long, spanning eleven years.  Plaintiff first filed an
26   application for DIB on July 8, 2003, alleging a disability onset date of October 21, 2002.
27   Administrative Record ("AR") 119-20.  This application was denied initially and again upon
28   reconsideration.  See AR 119.  On August 12, 2005, a hearing was held before Administrative

                                         1

1    Law Judge ("ALJ") Antonio Acevedo-Torres, at which plaintiff appeared and was represented by

2    counsel. AR 141-55. By written decision dated November 17, 2005, ALJ Acevedo-Torres found

3    that plaintiff was not disabled because she retained the capacity to perform sedentary, unskilled

4    work that allowed her to perform the alternative jobs of surveillance system monitor, election

5    clerk, and call-out operator. AR 116-38. Plaintiff requested that the Appeals Council review the

6    unfavorable decision, but plaintiff's request was declined. <u>See</u> AR 905.

7        Subsequently, plaintiff filed a new application for DIB on March 7, 2007, again alleging

8    the onset of disability on October 21, 2002. AR 18, 281-85, 286-87. The application was denied

9    on initial review and again upon reconsideration, AR 163-66, 169-73, and plaintiff thereafter

10    requested that her claim be heard before an administrative law judge. On September 23, 2008, a

11    hearing was before ALJ Peter F. Belli, at which plaintiff, who was represented by a non-attorney

12    representative, appeared, as did vocational expert ("VE") Jim Van Eck. AR 196, 903-40. A

13    supplementary hearing was also held before ALJ Belli on June 25, 2009, at which plaintiff,

14    plaintiff's counsel, and vocational expert Susan Creighton-Clavel appeared. AR 100-15, 218-19.

15    On August 26, 2009, ALJ Belli issued an unfavorable decision, finding that plaintiff retained the

16    capacity to perform a reduced range of sedentary work that allowed her to perform her past

17    relevant work ("PRW") as a bakery manager and office manager. AR 144-55.

18        Upon request, AR 221-23, the Appeals Council vacated the ALJ's decision and remanded

19    the case, instructing the ALJ to (1) clarify the meaning of the terms "slightly" and "moderately"

20    as used to describe certain mental limitations in his statement of plaintiff's residual functional

21    capacity ("RFC"), in addition to the frequency and duration of the optional breaks to alternate

22    sitting and standing; (2) articulate any new and material evidence supporting his finding that

23    plaintiff has fewer non-exertional limitations than she was found to have in the prior 2005

24    decision; (3) further consider whether the limitations assessed in his RFC conflict with the

25    performance of any of plaintiff's PRW and whether her work as a bakery manager properly

26    constitutes PRW; and (4) obtain supplemental evidence from a vocational expert to clarify the

27    effect of his assessed limitations on plaintiff's ability to perform PRW and other work, and,

28    before relying on the occupational evidence given by the VE, to identify and resolve any conflicts

1   between that evidence and the information in the Dictionary of Occupational Titles ("DOT") and

2   the Selected Characteristics of Occupations ("SCO").  AR 156-60.

3         On remand from the Appeals Council, another hearing was held before ALJ Belli on

4   September 14, 2011.  AR 83-99, 253.  At that hearing, the ALJ concluded that the administrative

5   record at that point did not include certain medical evidence without which he could not propound

6   a sufficiently accurate or complete hypothetical question to the VE, stating that he would

7   reschedule another hearing to consider that evidence after it had been added to the record.  AR

8   96-99.  The subsequent hearing was held before ALJ Belli on February 22, 2012.  AR 47-82.  By

9   written decision dated March 30, 2012, the ALJ found that plaintiff retained the capacity to

10  perform a reduced range of sedentary work that allowed her to perform her PRW as an office

11  manager or, in the alternative, to perform the alternative jobs of cashier II, information clerk, and

12  production worker, and that she was therefore not disabled.  AR 18-32.  Specifically, the ALJ

13  made the following findings (citations to 20 C.F.R. omitted):

14      1.   The claimant last met the insured status requirements of the
15          Social Security Act on December 31, 2008.

16      2.   The claimant did not engage in substantial gainful activity
           during the period from her alleged onset date of October 21,
17          2002 through her date last insured of December 31, 2008.

18      3.   In the prior decision, it was found that through the date last
           insured, the claimant had the following severe impairments:
19          fibromyalgia syndrome and fatigue, degenerative disc disease
           of the cervical spine and mild spondylosis, a history of pseudo
20          tumor cerebri, a history of chronic migraine headaches,
           exogenous obesity, and a depressive disorder.  However, in
21          giving the claimant the benefit of ever tenable doubt, the
           undersigned finds that the current evidence of record is new
22          and material in that [it] establishes a worsening condition
           during the pertinent period.

23      4.   The prior decision found that through the date last insured, the
           severity of the claimant's impairments did not meet or equal
24          the requirements of any listed impairment.  The current record
           contains no evidence of a changed circumstance or worsening
25          condition that would warrant a change in this conclusion.
           Thus, the prior findings regarding the listings are adopted.
26

27      5.   In the prior decision, it was found that the claimant was able to
           perform a full range of sedentary exertion, and that she was
           limited to simple, repetitive tasks.  Having considered the
28          additional evidence obtained in connection with the current

claim, the undersigned finds that new and material evidence exists to conclude that the claimant currently has a greater physical disability. Nonexertionally, the new evidence shows an increase in the claimant's mental residual functional capacity, which is new and material in that it establishes that she has a higher functional capacity than in the past. Specifically, it is found that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she has the residual functional capacity to lift, carry, push and/or pull 10 pounds occasionally and 5 pounds frequently; and sit 8 hours of an 8-hour workday with normal breaks. She requires a sit/stand option, not leaving the workstation, about 30-45 minutes at a time. She can stand/walk 6 hours in an 8-hour workday, with normal breaks, and no prolonged walking or standing, about 30-40 minutes at a time. She cannot climb ladders, ropes or scaffolds. She can never perform occasional stooping, crouching kneeling and crawling.

Non-exertionally, there are no limitations on the ability to understand, remember and carry out short, simple instructions or the ability to make judgments on simple work[-]related decisions. She can perform complex instructions frequently. There are no limitations in the ability to interact appropriately with the public, supervisors and coworkers, and there are no limitations on the ability to respond appropriately to work pressures in a usual work setting or in changes in the work setting.

6. In the prior decision, it was found that the claimant was unable to perform any of her past relevant work through the date last insured. Based upon the credible testimony of the vocational expert, the undersigned finds that the claimant is capable of performing her past relevant work as an officer manager. This work did not require the performance of work[-]related activities precluded by the claimant's residual functional capacity. This provides new and material evidence that refutes the findings in the prior decision.

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from October 21, 2002, the alleged onset date, through December 31, 2008, the date last insured.

AR 18-32.

Plaintiff then requested that the Appeals Council review the unfavorable decision, submitting additional legal arguments in support of her claim. AR 12-14, 375-82. By Notice dated June 26, 2013, the Appeals Council declined to set aside the ALJ's decision, making it the final decision of the Commissioner. AR 1-6.

////

4

1                                    FACTUAL BACKGROUND

2          Born on March 6, 1978, plaintiff was twenty-four years old on the alleged onset date of

3    disability and thirty-three years old on the February 22, 2012 hearing before ALJ Belli.  Plaintiff

4    completed high school and some college courses.  AR 54.  Plaintiff last worked as an office

5    manager.  AR 67.

6                                    LEGAL STANDARDS

7          The Commissioner's decision that a claimant is not disabled will be upheld if the findings

8    of fact are supported by substantial evidence in the record and the proper legal standards were

9    applied.  Schneider v. Comm'r of the Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000);

10   Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); Tackett v. Apfel,

11   180 F.3d 1094, 1097 (9th Cir. 1999).

12         The findings of the Commissioner as to any fact, if supported by substantial evidence, are

13   conclusive.  See Miller v. Heckler, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is

14   more than a mere scintilla, but less than a preponderance.  Saelee v. Chater, 94 F.3d 520, 521 (9th

15   Cir. 1996).  "It means such evidence as a reasonable mind might accept as adequate to support a

16   conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v.

17   N.L.R.B., 305 U.S. 197, 229 (1938)).  "While inferences from the record can constitute

18   substantial evidence, only those 'reasonably drawn from the record' will suffice."  Widmark v.

19   Barnhart, 454 F.3d 1063, 1066 (9th Cir.2006) (citation omitted).

20         Although this Court cannot substitute its discretion for that of the Commissioner, the

21   Court nonetheless must review the record as a whole, "weighing both the evidence that supports

22   and the evidence that detracts from the [Commissioner's] conclusion."  Desrosiers v. Sec'y of

23   Health & Hum. Servs., 846 F.2d 573, 576 (9th Cir.1988); see also Jones v. Heckler, 760 F.2d

24   993, 995 (9th Cir.1985).

25         "The ALJ is responsible for determining credibility, resolving conflicts in medical

26   testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001)

27   (citations omitted).  "Where the evidence is susceptible to more than one rational interpretation,

28   one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  Thomas v.

1   Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).   However, the court may review only the reasons

2   stated by the ALJ in her decision "and may not affirm the ALJ on a ground upon which [s]he did

3   not rely."   Orn v. Astrue, 495 F.3d 625, 630 (9th Cir.2007); see also Connett v. Barnhart, 340

4   F.3d 871, 874 (9th Cir. 2003).

5          The Court will not reverse the Commissioner's decision if it is based on harmless error,

6   which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the

7   ultimate nondisability determination.'"   Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir.

8   2006) (quoting Stout v. Comm'r, 454 F.3d 1050, 1055 (9th Cir. 2006)); see also Burch v.

9   Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

10                                          ANALYSIS

11         Plaintiff seeks remand and/or an award of benefits based on the ALJ's alleged error in

12  rejecting certain medical opinions and relying on the VE's testimony that conflicted with the

13  DOT.   The Commissioner argues that the ALJ's decision is supported by substantial evidence and

14  is free from legal error.

15  A.     Medical Opinions – Physical Impairments

16         Plaintiff first argues that the ALJ erred in rejecting the opinion of plaintiff's treating

17  physician, Dr. Marci Snodgrass, and medical consultant, Dr. H.D. Crowhurst, when assessing

18  plaintiff's physical impairments.

19         1.     Legal Standards

20         There are three types of physicians relevant to disability determinations: treating[1]

21  physicians, examining[2] physicians, and nonexamining[3] physicians.   "If a treating doctor's opinion

---

[1] A treating physician is a doctor "who has provided treatment to the claimant on more than one
occasion."   See 20 C.F.R. § 404.1527.   Whether a physician is a treating physician is determined
based on the "duration of the relationship and the frequency and nature of the contact."   Le v.
Astrue, 529 F.3d 1200, 1201 (9th Cir. 2008) (quoting Benton v. Barnhart, 331 F.3d 1030, 1038
(9th Cir. 2003) (citation omitted)).
[2] An examining (or consulting) physician "examines a patient once, not for the purpose of treating
the patient, but only for the purpose of providing a diagnosis for some other individual or
agency."   See 20 C.F.R. § 404.1527.
[3] The Social Security Administration has physicians on its staff called nonexamining physicians
who read and review disability application case files and make conclusions about claimants'
disability statuses and Residual Functional Capacities.   See 20 C.F.R. § 404.1527.

1   is not contradicted by another doctor (*i.e.*, there are no other opinions from examining or

2   nonexamining sources), it may be rejected only for 'clear and convincing' reasons supported by

3   substantial evidence in the record."  See Ryan v. Comm'r of Soc. Sec. Admin., 528 F.3d 1194,

4   1198 (9th Cir. 2008); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  "If the ALJ rejects a

5   treating or examining physician's opinion that is contradicted by another doctor, he must provide

6   specific, legitimate reasons based on substantial evidence in the record."  Valentine v. Comm'r of

7   Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); Ryan, 528 F.3d at 1198.

8   "[T]he medical opinions of a claimant's treating physicians are entitled to special weight."

9   Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir. 1988).  If the ALJ disregards a treating physician's

10  opinion, the ALJ must "set[] out a detailed and thorough summary of the facts and conflicting

11  clinical evidence, stating his interpretation thereof, and making findings."  Id. (quoting Cotton v.

12  Bowen, 799 F.2d 1403, 1408 (9th Cir. 1986)).  Moreover, [t]he ALJ need not accept the opinion

13  of any physician, including a treating physician, if that opinion is brief, conclusory, and

14  inadequately supported by clinical findings.  Thomas, 278 F.3d at 957 (citation omitted).  "To

15  evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its

16  source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical

17  findings support the opinions."  Esposito v. Astrue, 2012 WL 1027601, at *3 (E.D. Cal. Mar. 26,

18  2012).

19  A nonexamining physician's function is to read medical evidence in claimants' case

20  records, decide whether or not the claimants' impairments meet or equal the Listings, and

21  determine the claimants' Residual Functional Capacities.  20 C.F.R. § 416.927(e)(1)(i).  Because

22  nonexamining physicians do not have the benefit of hearing the claimant's complaints of pain,

23  their opinions as to claimants' pain are of "very limited value."  Penny v. Sullivan, 2 F.3d 953,

24  957 (9th Cir. 1993).

25  The Ninth Circuit has found that "[t]he ALJ has the duty to develop the record . . . even

26  when the claimant is represented by counsel."  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir.

27  1991).  "If the ALJ thought he needed to know the basis of [physicians'] opinions in order to

28  evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the

1    physicians or submitting further questions to them."  Smolen v. Chater, 80 F.3d 1273, 1288 (9th

2    Cir. 1996); see also Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001); Tidwell v. Apfel,

3    161 F.3d 599, 602 (9th Cir. 1999); Armstrong v. Comm'r of Soc. Sec. Admin., 160 F.3d 587,

4    589-90 (9th Cir. 1998) (holding that where the record is ambiguous as to the onset of disability,

5    the ALJ must call a medical expert to aid in determining the onset date).

6         The weight given to a particular physician's opinion is also partially determined by the

7    physician's specialty or practice area, especially for diseases that are complex and difficult to

8    diagnose.  "Specialized knowledge is particularly important with respect to a disease such as

9    fibromyalgia, which is poorly understood within much of the medical community."  Contreras v.

10   Astrue, 378 Fed. Appx. 656, 658 (9th Cir. 2010) (quoting Benecke v. Barnhart, 379 F.3d 587 (9th

11   Cir. 2004)).

12        2.    Dr. Marci Snodgrass, Treating Physician

13             a.    Relevant Background

14                  i.    Treatment History

15        Treating physician, Dr. Marci Snodgrass, began treating plaintiff in November 2006 for,

16   inter alia, excessive menstruation, myalgia and myositis NOS, common migraine, endometriosis,

17   obesity, and depressive disorder.  AR 624-29.  Dr. Snodgrass thereafter treated plaintiff every

18   month or two, see AR 730, for fibromyalgia, chronic fatigue and chronic depression.  In the

19   treatment records, Dr. Snodgrass notes an overall normal physical examination and distress levels

20   ranging from zero to mild, see, e.g., 455, 471, 476, 483, 494, 511, 536, 783, 790; while also

21   noting the presence of multiple positive trigger points for fibromyalgia, see, e.g., AR 790;

22   plaintiff's pain and fatigue related to fibromyalgia, see, e.g., AR 455, 462, 482, 545-46, 784, 789;

23   and medication prescribed for pain management for fibromyalgia, including Vicodin and MS

24   Contin, see, e.g., AR 455, 463, 490, 528-29, 545-46, 782;

25                  ii.    May 2007 Multiple Impairment Questionnaire

26        On May 8, 2007, Dr. Snodgrass completed a Multiple Impairment Questionnaire.  AR

27   730-37.  Based on her treatment of plaintiff for fibromyalgia, chronic fatigue and chronic

28   depression, Dr. Snodgrass gave plaintiff a fair prognosis due to multiple tender trigger points, a

somewhat blunted affect, and good insight.  She noted that plaintiff had chronic pain throughout her body and experienced daily and severe fatigue.  As for plaintiff's pain, Dr. Snodgrass noted that plaintiff experienced constant and daily muscle aches and fatigue located on her back, legs, arms, neck and hips.  The precipitating factors were listed as "any activities, incl. any housework."  Dr. Snodgrass rated plaintiff's pain as between 4-9 on a scale of 0-10 (0-1=none through 9-10=severe), noting that the pain varies with medication.  She also listed plaintiff's level of fatigue as a 10 on a scale of 0-10.

As a result of these impairments, Dr. Snodgrass determined that, in an 8-hour workday, plaintiff can sit for four hours with a need to get up and move around for 5-10 minutes every one to two hours.  Plaintiff could stand/walk for 0-1 hours in an 8-hour workday, frequently lift up to 5 pounds, occasionally lift up to 20 pounds, and never lift over 20 pounds.  She could also frequently carry up to 5 pounds, occasionally carry up to 10 pounds, and never carry over 10 pounds.  As for plaintiff's degree of limitation, Dr. Snodgrass determined that plaintiff had marked limitations in her ability to grasp, turn, and twist objects, as well as use her arms for reaching.  She had moderate limitations in her ability to use her fingers and hands for fine manipulations.  Dr. Snodgrass also noted that plaintiff's pain and fatigue would frequently interfere with her attention and concentration, that these symptoms are ongoing, that plaintiff cannot do a full-time competitive job that requires activity on a sustained basis, and that plaintiff's chronic depression contributes to the severity of her symptoms and functional limitations.

### iii.     September 2008 Fibromyalgia Impairment Questionnaire

On September 18, 2008, Dr. Snodgrass completed a Fibromyalgia Impairment Questionnaire.  AR 823-28.  Dr. Snodgrass noted that plaintiff meets the American Rheumatological criteria for fibromyalgia, that her symptoms and limitations started in 2002, that her other diagnosed impairments are migraines and depression, and that the clinical symptoms relied upon were fatigue and multiple positive trigger points, which Dr. Snodgrass found to be reasonably consistent with plaintiff's impairments.  The pain was described as constant and daily with a severity of 7+ on a scale of 0-10.  Dr. Snodgrass noted that plaintiff is not a malingerer.

As for plaintiff's functional limitations, Dr. Snodgrass opined that plaintiff could sit for 2 hours and stand for 0-1 hours in an 8-hour workday. She noted that plaintiff could occasionally lift / carry up to 5 pounds, but can never lift or carry more than 5 pounds. She found that plaintiff is capable of low stress jobs, that she would need to take unscheduled breaks to rest during an 8-hour workday, that she experiences mostly bad days, and that she would likely be absent from work as a result of her impairments more than three times a month.

b.     <u>Analysis</u>

The ALJ gave no evidentiary weight to the significant functional limitations assessed by Dr. Snodgrass in either the May 2007 or September 2008 statements. <u>See</u> AR 27. The ALJ made this determination based on the following: (1) Dr. Snodgrass's alleged failure to discuss how she arrived at her conclusion that plaintiff is limited to less than a sedentary level of exertion; (2) her minimal findings at the times of her evaluations were not consistent with the extreme limitations imposed and appear instead to be based on plaintiff's subjective complaints; (3) Dr. Snodgrass's opinion that plaintiff is unable to work is an opinion regarding disability that is reserved to the Commissioner; and (4) the conclusions reached by Dr. Snodgrass are inconsistent with the findings of Dr. Michael Goodman, who treated plaintiff from August 2004 through November 2006, and those of consultative examiner Dr. Janet O'Brien.

i.     <u>Failure to Support Conclusion and Minimal Findings during</u>

<u>Evaluations</u>

Considering together the first two of the ALJ's reasons for rejecting Dr. Snodgrass's opinion, the Court finds that, based on the nature of fibromyalgia, the ALJ erred in relying upon the doctor's alleged failure to discuss her conclusions and the alleged lack of objective medical evidence for the limitations assessed.

The Ninth Circuit has noted that fibromyalgia is a definite but elusive affliction:

> [F]ibromyalgia, previously called fibrositis, [is] a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue. [citations omitted] Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease. [citations omitted] Fibromyalgia's cause is unknown, there is no cure, and it is poorly

understood within much of the medical community.  *The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms.*  The American College of Rheumatology issued a set of agreed upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis. [citations omitted]

Benecke, 379 F.3d at 589 (emphasis added).  Fibromyalgia "symptoms are entirely subjective." Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 872 (9th Cir. 2004) (citing Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996)).  There are no objective tests which can be used to conclusively confirm a diagnosis of fibromyalgia.  Benecke, 379 F.3d at 594 (deciding "[t]he ALJ erred by 'effectively requir[ing] "objective" evidence for a disease that eludes such measurement.'" (quoting Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003))); Jordan, 370 F.3d at 872 (finding "[t]here are no laboratory tests for the presence or severity of fibromyalgia.").  A lack of objective test results does not entitle the ALJ to discount a diagnosis of fibromyalgia.  See Stanley v. Astrue, CIV S-10-0563 EFB, 2011 WL 4565873 (E.D. Cal. Sept. 29, 2011) (finding that "the ALJ's assertion that the treating physicians based their diagnoses on plaintiff's subjective remarks and medical history is not a 'clear and convincing' reason for rejecting their opinions.").

"[D]iagnosis is now based on patient reports of a history of pain in five parts of the body, and patient reports of pain when at least 11 of 18 points cause pain when palpated by the examiner's thumb." Jordan, 370 F.3d at 872.  "Objective tests are administered to rule out other diseases, but do not establish the presence or absence of fibromyalgia." Id.  "Objective physical signs, laboratory results, and x-ray results are generally negative, and '[b]ecause the majority of patients appear tense and anxious and have no recognizable objective basis for symptoms, the syndrome is often considered psychogenic.'" Id. (quoting 1 Cecil Textbook of Medicine 208 (Paul Besson, et al., eds., 15th ed. 1979)).  The Ninth Circuit, "however, has recognized fibromyalgia as a physical rather than a mental disease." Id. (citing Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech., Inc., 125 F.3d 794, 796, 799 (9th Cir. 1997)).

Fibromyalgia is diagnosed by "a process of exclusion and a 'testing of certain 'focal tender points' on the body for acute tenderness.'" Bunnell v. Sullivan, 947 F.2d 341, 342 (9th

1    Cir. 1991) (citing Preston v. Sec'y of Health & Human Servs., 854 F.2d 815, 817-18 (6th Cir.

2    1988)).  The Social Security Administration has endorsed the American College of Rheumatology

3    standard that a diagnosis requires the presence of at least eleven out of eighteen tender points on

4    digital palpitation and widespread pain throughout the four quadrants of the body.  Benecke, 379

5    F.3d at 590; Wolfe F, et al., 1990 Criteria for the Classification of Fibromyalgia (Excerpt),

6    American College of Rheumatology (last visited July 7, 2014), http://www.rheumatology.org/

7    practice/clinical/ classification/fibromyalgia/fibro.asp.  Common symptoms "include chronic pain

8    throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance

9    that can exacerbate the cycle of pain and fatigue associated with this disease."  Benecke, 379 F.3d

10   at 590 (citing Brosnahan v. Barnhart, 336 F.3d 671, 672 n.1 (8th Cir. 2003); Cline v. Sullivan,

11   939 F.2d 560, 563 (8th Cir. 1991)).  "The process of diagnosing fibromyalgia includes (1) the

12   testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions

13   through objective medical and clinical trials."  Stone v. Astrue, 804 F. Supp. 2d 975, 984 (D.

14   Ariz. 2011) (citing Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 244 (6th Cir. 2007)).

15          Here, the absence of objective clinical findings cannot serve as a basis to discount Dr.

16   Snodgrass's medical opinion because "[o]bjective physical signs, laboratory results, and x-ray

17   results are generally negative."  Jordan, 370 F.3d at 872; see also Garcia v. Astrue, 2013 WL

18   253486 (D. Ariz. 2013) (finding that "in stark contrast to the unremitting pain of which fibrositis

19   patients complain, physical examinations will usually yield normal results—a full range of

20   motion, no joint swelling, as well as normal muscle strength and neurological reactions.").  The

21   ALJ's evaluation failed to consider that fibromyalgia diagnoses are diagnoses of exclusion, and

22   that Dr. Snodgrass's evaluations, which revealed multiple positive tender points, have met the

23   standard for diagnosing fibromyalgia.  Furthermore, the limitations imposed by Dr. Snodgrass

24   correlate with the diagnosis of fibromyalgia, and the ALJ has not demonstrated why any further

25   discussion would have been necessary in light of Ninth Circuit authority on the nature of this

26   impairment.

27          ii.      Dr. Snodgrass's Conclusion that Plaintiff is Unable to Work

28          The ALJ next asserted that Dr. Snodgrass's opinion that plaintiff is unable to work is an

1   opinion regarding disability that is reserved to the Commissioner.  It is true that a treating

2   physician's statement on an issue reserved to the Commissioner, such as the ultimate

3   determination of whether a claimant is disabled, is not binding on the ALJ or entitled to special

4   weight.  See McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011) ("The law reserves the

5   disability determination to the Commissioner.").  The ALJ was, therefore, not bound by Dr.

6   Snodgrass's assertion that plaintiff was unable to work.  However, the fact that a treating

7   physician rendered an opinion on the ultimate issue of disability does not relieve the

8   Commissioner of the obligation to state specific and legitimate reasons supported by substantial

9   evidence for rejecting the treating physician's opinion.  See Reddick v. Chater, 157 F.3d 715, 725

10  (9th Cir. 1998); Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993).

11              iii.     Inconsistency with Findings of Dr. Michael Goodman and Dr. Janet

12                       O'Brien

13  Lastly, the ALJ rejected Dr. Snodgrass's opinion based on its inconsistency with the

14  findings of plaintiff's former treating physician, Dr. Michael Goodman, and examining

15  consultant, Dr. Janet O'Brien.

16                       • Dr. Michael Goodman

17  Dr. Michael Goodman treated plaintiff from August 2004 through November 2006.  AR

18  432-40.  His notes reveal normal objective results, treatment and follow-up for amenorrhea and a

19  respiratory infection, and a repeated assessment of fibromyalgia.  In his last treatment note dated

20  November 10, 2006, Dr. Goodman reviewed plaintiff's medications and indicated that plaintiff

21  "reports acceptable control of her myalgias with her regiment of Cymbalta 120 mg q.u.m. and

22  Serzone 300 mg q.h.s."  Id. at 440.

23  Plaintiff argues that the ALJ failed to explain how these notes are inconsistent with Dr.

24  Snodgrass's opinion, and that, in any event, Dr. Goodman is an OB/GYN specialist who never

25  undertook to be the primary source of care for plaintiff's fibromyalgia.  The Commissioner does

26  not respond to these arguments, and the Court agrees that there does not appear to be an

27  inconsistency between Dr. Snodgrass's opinion and these notes since both reveal normal

28  objective medical results and the use of medication to manage plaintiff's fibromyalgia pain.

13

1   Thus, to the extent the ALJ relied on an inconsistency between Dr. Snodgrass's treatment history

2   and Dr. Goodman's treatment history, the Court finds that he erred.

3                                    • Dr. Janet O'Brien

4        *Relevant Background*

5            On June 19, 2007, Dr. Janet O'Brien conducted a complete internal medicine evaluation

6   of plaintiff, whose chief complaints were fibromyalgia, degenerative disc disease, depression and

7   headaches.  AR 738-46.  Dr. O'Brien first reviewed the history of plaintiff's chief complaints,

8   noting that plaintiff's fibromyalgia was diagnosed in 1995 and the degenerative disc disease was

9   diagnosed in 1999.  She also noted plaintiff's statements regarding the impact of her impairments

10  on her activities of daily living:

11              She notes that she can mop the floor but for days afterwards she
                will be in "so much pain." It is difficult for her to focus. She tries to
12              do research but falls asleep while on the computer. She notes that
                her grandmother helps care for the children. She can't go and do
13              anything because she has to frequently change position. During the
                day she watches the children and sometimes plays board games
14              with them. She makes the children's lunch. She can't stand long
                enough to make big dinners. She reads short stories because she
15              tends to fall asleep while reading. She notes that she can't do
                mopping, sweeping, or vacuuming because "it is hard." She does
16              some dishes. She sits on the couch and folds laundry. Her husband
                does the grocery shopping but she will go with him and ride on a
17              cart. She will wipe the sink but be unable to clean the rest of the
                bathroom.
18

19  AR 739.

20           Dr. O'Brien's physical examination revealed a "[w]ell-developed, well-nourished

21  morbidly obese woman in no acute distress. . . . She demonstrates no guarding with moving about

22  the examination room.  She moves briskly.  [¶]  She demonstrates no difficulty walking down the

23  hall to the examination room, no difficulty sitting during the history, and no difficulty getting

24  onto the examination table."  AR 740.  The doctor noted mostly normal results, though did

25  identify decreased range of motion of the cervical spine, upper extremities, hips and knees.  Dr.

26  O'Brien ultimately diagnosed plaintiff with fibromyalgia, noting that she had 16 positive tender

27  points on exam, but also noting that she had 16 positive control points.  AR 745.  She indicated

28  that plaintiff's symptoms are partly consistent with those of fibromyalgia and that her physical

                                              14

1   exam would fulfill the criteria of the American College of Rheumatology.  Dr. O'Brien also

2   diagnosed plaintiff with neck pain and stiffness, depression, and headaches.

3       As for plaintiff's functional limitations, Dr. O'Brien opined that plaintiff could stand,

4   walk and/or sit 6 hours in an 8-hour workday; could ambulate as needed; would not need an

5   assistive device; could lift and carry 25 pounds frequently and 50 pounds occasionally, limited by

6   morbid obesity; could stoop, crouch, kneel and climb 2 hours in an 8-hour workday, limited by

7   morbid obesity; could reach, handle, grasp, feel and finger without limitation bilaterally; and

8   would have no visual, communicative or workplace environmental limitations.  AR 745-46.

9       *Analysis*

10      In giving reduced weight to Dr. Snodgrass's opinion, the ALJ relied in part on the

11  inconsistency between that opinion and the findings of this consultative examiner:

12  > Dr. O'Brien noted the claimant reported that she watches her
13  > children during the day and plays board games with them, makes
    > their lunch but cannot stand long enough to make dinner, and
14  > cannot go and do anything due to frequently changing positions.
    > Examination revealed she was in no acute distress, was obese and
15  > demonstrated no guarding with moving about, moved briskly, had
    > no difficulty walking down the hall, sitting, getting on the
16  > examination table, and removing her sandals.  She squatted halfway
    > and rose without difficulty.  The claimant had 16 tender points
17  > positive and 16 controls points positive. The doctor's impression
    > was of fibromyalgia per claimant's history, neck pain and stiffness
18  > per claimant's history, depression, and headaches. Although Dr.
    > O'Brien opined the claimant could perform medium exertion, her
19  > narrative report indicates that the claimant had decreased range of
    > motion of the cervical spine, upper extremities, hips and knees. The
20  > undersigned finds that the objective findings cited in her report
    > support the residual functional capacity which has been established
21  > in this case.

22  AR 27.

23      Plaintiff argues that the ALJ erred because Dr. O'Brien's report in fact supports Dr.

24  Snodgrass's assessment, but differs only in the conclusions.  The Commissioner counters that,

25  despite plaintiff's statements regarding her limitations, Dr. O'Brien's independent examination

26  and observations revealed that plaintiff could perform medium exertion activity.

27      In <u>Orn v. Astrue</u>, 495 F.3d 625 (9th Cir. 2007), the Court of Appeals described the

28  interaction between an opinion from a consultant and an opinion from a treating physician:

1

> When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her own conclusions, the conclusions of the examining physician are not "substantial evidence."

495 F.3d at 632.  The Court went on to contrast that situation with the situation in which the examining physician made his own independent findings, in which case the findings can stand as substantial evidence.  The Court then explained that "[i]ndependent clinical findings can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence . . . or (2) findings based on objective medical tests that the treating physician has not herself considered. . . ."  Id. (citations omitted).

In this case, Dr. O'Brien's conclusions were based on her own examination of plaintiff.  However, the Commissioner has not established any diagnoses that differ from those offered by Dr. Snodgrass.  She has also failed to show that Dr. O'Brien's findings are based on objective medical tests that Dr. Snodgrass did not herself consider.  Indeed, Dr. O'Brien, like Dr. Snodgrass, noted that, despite otherwise normal physical examinations, plaintiff tested positive for multiple trigger points.  Dr. O'Brien even admitted that plaintiff's symptoms are partly consistent with those of fibromyalgia and that her physical exam would fulfill the criteria of the American College of Rheumatology.  Under Orn, then, the ALJ erroneously relied on the consultative examiner's conclusions regarding plaintiff's functional limitations in giving reduced weight to the opinion of the treating physician.  For these reasons, the Court finds that the ALJ indeed erred in his consideration of Dr. Snodgrass's opinion.

3.      Dr. H.D. Crowhurst, Medical Consultant

Plaintiff also challenges the ALJ's consideration of the opinion of medical consultant, Dr. H.D. Crowhurst.  On July 17, 2007, Dr. Crowhurst provided a Physical Residual Functional Capacity Assessment wherein he considered plaintiff's diagnoses of fibromyalgia, obesity, degenerative disc disease and migraines.  AR 748-52.  Dr. Crowhurst assessed the following exertional limitations: plaintiff can occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand / walk / sit (with normal breaks) for a total of 6 hours in an 8-hour workday.  She should never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs, stoop,

kneel, crouch, and crawl; and can frequently stoop.  Plaintiff is limited in reaching in all directions, though unlimited in handling, fingering or feeling.

The ALJ gave limited weight to this opinion "because the evidence shows the claimant is more limited than determined by the non-examining state agency consultants.  Furthermore, the state agency consultants did not adequately consider the claimant's subjective complaints or the combined effect of her impairments."  AR 28-29.

Plaintiff does not challenge the ALJ's specific reasons for rejecting Dr. Crowhurst's opinion.  Rather, plaintiff's argument as to this consulting physician is premised on the ALJ's alleged error in rejecting Dr. Snodgrass's opinion.  See Pl.'s Mot. Summ. J. at 17.  That is, plaintiff argues that the ALJ should have used Dr. Crowhurst's opinion to reject Dr. O'Brien's opinion, which, in turn, would have resulted in a finding that the ALJ erred in rejecting Dr. Snodgrass's opinion.  But because the Court has now found that the ALJ indeed erred in rejecting Dr. Snodgrass's opinion, this argument has been rendered moot.

C.      Medical Opinions – Mental Impairments

Plaintiff next argues that the ALJ erred in his consideration of plaintiff's mental impairments.  Whereas ALJ Belli initially imposed multiple limitations due to plaintiff's mental impairments, his most recent decision found no limitations other than an ability to perform complex instructions frequently.  Plaintiff asserts that the ALJ failed to support this assessment with substantial evidence.

1.      The ALJ's Functional Assessment

In ALJ Belli's August 26, 2009 decision, he assessed plaintiff's non-exertional limitations as follows: plaintiff is moderately limited understanding and remembering detailed instructions, and slightly limited carrying out detailed instructions, making judgments on detailed work-related decisions, and interacting with co-workers, supervisors, and the public.  AR 148.

In his most recent decision, the ALJ concluded that plaintiff had almost no functional limitations associated with her mental health.  The ALJ noted that, "Nonexertionally, the new evidence shows an increase in the claimant's mental residual functional capacity, which is new and material in that it establishes that she has a higher functional capacity than in the past."  AR

1   24.  The ALJ found that

> . . . there is no objective evidence to establish disability due to
> depression or problems with stress.  There is no report of any
> longitudinal history of mental illness.  Although the claimant's
> treating practitioner prescribed anti-depressant medication, there is
> no evidence that the claimant sought psychiatric or psychological
> treatment from any other source.  The undersigned concludes that
> there are no limitations on the ability to understand, remember and
> carry out short, simple instructions or the ability to make judgments
> on simple work related decisions.  She can perform complex
> instructions frequently. There are no limitations in the ability to
> interact appropriately with the public, supervisors and coworkers,
> and [there is] no limitations on the ability to respond appropriately
> to work pressures in a usual work setting or in changes in the work
> setting.

AR 27.

The ALJ's conclusions were based on the "generally consistent" August 20, 2007 findings

of psychiatric examiner, Dr. Doug Dolnak, and on the December 1, 2008 opinion of consultative

psychologist, Dr. David Richwerger.  The ALJ specifically rejected the opinions of four state

agency medical consultants and the opinion of Dr. Snodgrass.

    2.   <u>Dr. David Richwerger, Consultative Psychologist</u>

       a.   <u>Background</u>

Consultative psychologist, Dr. David Richwerger, conducted a psychological evaluation

of plaintiff on December 1, 2008.  AR 829-36.  At the evaluation, plaintiff denied ever having

been admitted to a psychiatric hospital, though she did receive some outpatient psychiatric

treatment as a teenager in 2001, 2002, and 2003.  She reported difficulty with concentration and

memory, denied hallucinations, related her pain to her depression, and admitted that she was not

currently seeing a psychiatrist or therapist.

Dr. Richwerger's mental status examination revealed that plaintiff could respond to most

simple tasks, but on certain tasks her performance appeared to be consistent with a low level of

effort.  Similarly, he found that, with respect to concentration and memory, she could recall only

three digits forward and two digits backward, which Dr. Richwerger found to be inconsistent with

earlier aspects of her verbal behavior.  As for results of the psychological tests that were

administered, Dr. Richwerger noted that the results are of questionable validity because plaintiff

1    had responses that appeared consistent with a low level of effort regarding certain cognitive tests.

2    See AR 833.

3          Dr. Richwerger's Axis I diagnostic impression of plaintiff was (1) rule out malingering

4    (regarding cognitive tests); (2) adjustment disorder with anxiety and depression, mild to

5    moderate, secondary to chronic pain issues; (3) rule out cognitive disorder, not elsewhere

6    specified (mild to moderate; however, this seems somewhat unlikely given the results of the test

7    of memory malingering).  He also assigned a GAF score of 61-70.

8          As for the functional assessment, Dr. Richwerger opined as follows: plaintiff has

9    moderate impairment in her ability to understand and remember complex instructions; mild

10    impairment in her ability to carry out complex instructions, to make judgments on complex work-

11    related decisions, to interact appropriately with the public, supervisors and co-workers; and no

12    impairment in her ability to understand, remember and carry out simple instructions, to make

13    judgments on simple work-related decisions, and to respond appropriately to usual work

14    situations and to changes in a routine work setting.

15              b.    Analysis

16          In considering Dr. Richwerger's opinion, the ALJ gave no weight to the doctor's

17    assessment of moderate mental limitations "based upon [Dr. Richwerger's] findings of poor effort

18    and possible malingering on the part of the [plaintiff] during psychological testing.  Further, the

19    restrictions are inconsistent with his own assessment of the claimant's [GAF] at 61 to 70, which is

20    indicative of only some mild mental to no more than slight mental impairment."  AR 28.

21          Plaintiff, apparently misreading the ALJ's decision, argues that the ALJ erred in rejecting

22    Dr. Richwerger's entire opinion, especially since his opinion encompasses a limitation that the

23    ALJ previously assessed (i.e., mild limitations on plaintiff's ability to make complex work-related

24    judgments and to interact with the public, supervisors, and coworkers).  See Pl.'s Mot. Summ. J.

25    at 17.  But a fair reading of the ALJ's decision reveals that the ALJ rejected only that portion of

26    Dr. Richwerger's opinion finding plaintiff *moderately* impaired in her ability to understand and

27    remember complex instructions; he did not reject the opinion entirely.

28          In any event, the reasons provided by the ALJ for rejecting this portion of Dr.

1    Richwerger's opinion are supported by substantial evidence.  Generally, Global Assessment of

2    Functioning is a scale reflecting the "psychological, social, and occupational functioning on a

3    hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental

4    Disorders at 34 (4th ed. 2000) ("DSM IV-TR").  A GAF rating between 61 and 70 indicates some

5    mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social,

6    occupational, or school functioning (e.g., occasional truancy, or theft within the household), but

7    generally functioning pretty well, has some meaningful interpersonal relationships.  Id. at 34.  In

8    this case, the ALJ found that the GAF score assessed by Dr. Richwerger was inconsistent with the

9    moderate impairment assessed.  An ALJ may properly rely on an inconsistency between a

10   functional assessment and a GAF score in rejecting a physician's opinion.  Graham v. Barnhart,

11   76 Fed. Appx. 829, 830 (9th Cir. 2003) (finding physician's opinion was properly rejected where

12   GAF score was inconsistent with findings in report).

13        The ALJ also rejected this portion of Dr. Richwerger's opinion based on his findings of

14   poor effort and possible malingering during psychological testing.  Upon administering the Test

15   of Memory Malingering, Dr. Richwerger noted that plaintiff's "score . . . is well below the cutoff

16   and consistent with a low level of effort, especially given the claimant's educational history."  AR

17   833.  He also noted that plaintiff scored in the borderline range on the WAIS-III test, but "this is

18   likely an underestimate of her actual cognitive ability.  The claimant made several obvious errors

19   in the Digit Symbol subsection, even after coaching and modeling."  Id.at 833-34.  Based on these

20   and other results, Dr. Richwerger concluded that plaintiff's "cognitive assessment test results are

21   of questionable validity.  The claimant had responses that appeared consistent with low level of

22   effort regarding certain cognitive tests."  Id. at 833.  Indeed, Dr. Richwerger's Axis I diagnostic

23   impression of plaintiff was, inter alia, rule out malingering (regarding cognitive tests), and rule

24   out cognitive disorder, not elsewhere specified (mild to moderate; "*however, this seems somewhat*

25   *unlikely given the results of the [test of memory malingering]*").  AR 835 (emphasis added).  A

26   discrepancy between clinical findings and a medical opinion is an appropriate reason for

27   discounting a doctor's opinion regarding the claimant's limitations.  See Bayliss v. Barnhart, 427

28   F.3d 1211, 1216 (9th Cir. 2005).

1    The ALJ's reliance on these findings in giving no weight to the moderate impairments

2    assessed by Dr. Richwerger was therefore not in error.  See Thomas v. Barnhart, 278 F.3d 947,

3    957 (9th Cir. 2002) (noting ALJ need not accept physician's opinion if unsupported by clinical

4    findings); Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995) (upholding ALJ's rejection of

5    examining psychologist's functional assessment that conflicted with his own written report and

6    test results); see also Gomez v. Astrue, 695 F. Supp. 2d 1049, 1055-56 (C.D. Cal. 2010) (finding

7    ALJ properly rejected IQ scores where physician opined that they were invalid because of

8    plaintiff's suboptimal effort or malingering).

9         3.    Dr. G.M. Rivera-Miya and Dr. Rosemary Tyl, State Agency Review Physicians

10    Plaintiff further argues that the ALJ erred in his rejection of the opinions of two of the

11    four State agency non-examining physicians, Dr. G.M. Rivera-Miya and Dr. Rosemary Tyl.  As

12    relevant here, both of these doctors opined that plaintiff is moderately impaired in her ability to

13    interact appropriately with the general public.  See AR 770, 820.  The ALJ gave limited weight to

14    these opinions "because the evidence shows the claimant is not as limited as determined by the

15    non-examining state agency consultants."  AR 29.

16    Although plaintiff is correct that an ALJ may not reject a doctor's opinion in a conclusory

17    fashion by stating, for example, that it is unsupported by or contrary to the evidence, see Embrey,

18    849 F.2d at 421-22, the Court finds that the ALJ did more than make this sort of conclusory

19    statement.  In the decision, and a few paragraphs preceding his discussion of these two state

20    agency review physicians, the ALJ concluded that plaintiff has no limitations in the ability to

21    interact appropriately with the public, supervisors and coworkers.  See AR 27.  The ALJ noted

22    that this finding was "generally consistent" with the August 20, 2007 psychiatric evaluation

23    conducted by Dr. Doug Dolnak.  AR 27-28, 753-57.  In his report, Dr. Dolnak reviewed with

24    plaintiff her illness, medical, psychiatric, and family, social and employment histories, and then

25    performed a mental status examination.  Among other things, Dr. Dolnak ultimately found that

26    plaintiff "can . . . interact with coworkers and the public."  AR 757.  The ALJ's reliance on the

27    opinion of an examining psychiatrist to reject the opinions of two non-examining physicians was

28    not in error.  See Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995).

1        4.      Plaintiff's Credibility

2        Additionally, the ALJ relied on plaintiff's lack of credibility in assessing her mental

3    impairments.  The ALJ specifically found that plaintiff's activities of daily living were

4    incompatible with her alleged degree of mental limitations.  See AR 29.  Plaintiff does not

5    challenge that finding here.  Accordingly, the ALJ did not err in discounting plaintiff's mental

6    limitations to the extent it was rendered in reliance on plaintiff's non-credible self-reports.  See

7    Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227-28 (9th Cir. 2009).

8        5.      Dr. Snodgrass's Opinion

9        Finally, the ALJ's finding that plaintiff has almost no mental impairments was based on a

10   rejection of Dr. Snodgrass's opinion.  Dr. Snodgrass determined that plaintiff's pain and fatigue

11   would frequently interfere with her attention and concentration, that these symptoms are ongoing,

12   that plaintiff cannot do a full-time competitive job that requires activity on a sustained basis, and

13   that plaintiff's chronic depression contributes to the severity of her symptoms and functional

14   limitations.  AR 730-37.  As discussed, the ALJ's rejection of Dr. Snodgrass's opinion was

15   improper.  Therefore, despite finding no error in the ALJ's consideration of the opinions of Dr.

16   Dolnak, Dr. Richwerger, and state agency consultants Dr. Rivera-Miya and Dr. Ty, the Court

17   acknowledges that these findings were based on an initial wholesale and improper rejection of Dr.

18   Snodgrass's opinion.  Because Dr. Snodgrass's opinion could have significant effects on the

19   weight given to the opinions of the examining and non-examining doctors, and therefore have

20   significant effects on the assessed mental limitations, the ALJ is directed to reconsider Dr.

21   Snodgrass's opinion in the context of both plaintiff's physical and mental impairments.

22   D.      Testimony of Vocational Experts

23       Plaintiff's final argument concerns the VE who testified at the February 2012

24   administrative hearing, Jim Van Eck, who erred when he associated the job title "office manager"

25   with an incorrect DOT number (210.382-046).  Even assuming error, this VE also testified that

26   the hypothetical individual with the identified set of functional limitations could perform the

27   alternative jobs of Cashier II (DOT 211.462-010), Information Clerk (DOT 237.367-018), and

28   Production Worker (Final Assembler, Optical Goods) (DOT 713.687-018).  AR 79-80.  Plaintiff

1   does not argue that any of these DOT numbers was incorrect.  Any error in associating the "office

2   manager" job with an incorrect DOT number was harmless since the VE identified multiple

3   alternative jobs associated with correct DOT numbers that could be performed.  Tommasetti v.

4   Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008) ("Finally, the court will not reverse an ALJ's

5   decision for harmless error, which exists when it is clear from the record that "the ALJ's error

6   was 'inconsequential to the ultimate nondisability determination'"), quoting Stout v. Comm'r,

7   454 F.3d 1050, 1055-56 (9th Cir. 2006); see also Yelovich v. Colvin, 2013 WL 3216042, at *1

8   (9th Cir. June 27, 2013) (ALJ's reliance on VE's incorrect testimony that claimant could perform

9   two occupations harmless when ALJ also relied on VE's accurate testimony that claimant could

10  perform third job).  Plaintiff is therefore not entitled to remand on this ground.

11  E.     Remand

12         Plaintiff asserts that this matter should be remanded for immediate payment of benefits

13  rather than further proceedings.  A remand for further proceedings is unnecessary if the record is

14  fully developed, and it is clear from the record that the ALJ would be required to award benefits.

15  Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  The decision whether to remand for

16  further proceedings turns upon the likely utility of such proceedings.  Barman v. Apfel, 211 F.3d

17  1172, 1179 (9th Cir. 2000).  In this matter, this Court concludes that outstanding issues remain

18  that must be resolved before a determination of disability can be made.  Pursuant to this remand,

19  the ALJ shall properly consider Dr. Snodgrass's opinion.

20                                         CONCLUSION

21         Accordingly, for the reasons stated above, IT IS HEREBY ORDERED that:

22     1.     Plaintiff's motion for summary judgment (ECF No. 11) be granted in part;

23     2.     The Commissioner's cross-motion for summary judgment (ECF No. 13) is denied;

24  and

25     3.     This matter is remanded for further proceedings consistent with this order.

26  DATED: July 29, 2014

27                                         _____
                                           ALLISON CLAIRE
28                                         UNITED STATES MAGISTRATE JUDGE